AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT

8/18/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____JB_____ DEPUTY

| United States of America | |
|---|---|
| v. | Case No. 2:21-mj-03854-DUTY |
| JENNIFER LEE LOPEZ, | |
| Defendant(s) | |

FILED
CLERK, U.S. DISTRICT COURT

August 18, 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____CD_____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 15, 2021, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1708 | Possession of Stolen Mail |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*Kimberly Granger*
Complainant's signature

Kimberly Granger, USPIS PI
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: August 18, 2021

Judge's signature

City and state: Los Angeles, California

Hon. Alka Sagar, U.S. Magistrate Judge
Printed name and title

**AFFIDAVIT**

I, Kimberly Granger, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Jennifer Lee Lopez ("LOPEZ") for a violation of Title 18, United States Code, Section 1708 (Possession of Stolen Mail).

2. This affidavit is also made in support of an application to search the following three devices (collectively, the "SUBJECT DEVICES"), in the custody of the United States Postal Inspection Service in Pasadena, California, as described more fully in Attachment A:

   a. A black TCL cellular phone with a cracked screen and silver circle attached to the case, bearing no visible serial number ("SUBJECT DEVICE 1");

   b. A blue/black Motorola cellular phone bearing IMEI 355539116767359 ("SUBJECT DEVICE 2"); and

   c. A white Acer laptop bearing serial number LUS550B11190504F11601 ("SUBJECT DEVICE 3").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1708 (Mail Theft and Possession of Stolen Mail), 1704 (Possession of Counterfeit or Unauthorized Postal Keys), 371 (Conspiracy), 1028 (Fraud and Related Activity in Connection with Identification Documents), 1029 (Access Device Fraud), 1344 (Bank Fraud), and 1028A

(Aggravated Identity Theft) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a Postal Inspector with the USPIS and have been so employed since July 2014. I am currently assigned to the Los Angeles Division, Pasadena Mail Theft Team, which investigates crimes against the United States Postal Service and crimes related to the misuse and attack of the mail system, including theft of United States mail, fraud, and related activity in connection with access devices and identity theft. I completed a twelve-week basic training course in Potomac, Maryland, which included training in the investigation of mail theft, identity theft, and drug distribution. I also completed a six-month basic training course at the Federal Law Enforcement Training Center. Through my training and experience, I am familiar with

the ways in which mail and identity thieves use cell phones and other digital devices to facilitate their crimes.

### III. **SUMMARY OF PROBABLE CAUSE**

6. On April 18, 2021, Arcadia Police Department ("APD") arrested LOPEZ for violation California Penal Code 530.5(c)(3), Identity Theft of more than ten persons after she discarded a bag containing stolen mail. During a search incident to arrest, law enforcement found stolen mail, access devices, and SUBJECT DEVICE 1 in LOPEZ's bag.

7. On May 15, 2021, APD arrested LOPEZ for violations of California Penal Code Sections 530.5(c)(3), Identity Theft of more than ten persons, and 530.5(E), Mail Theft, following the activation of a GPS bait package. During a search incident to arrest, law enforcement found stolen mail and access devices in LOPEZ's bag and on her person.

8. On June 30, 2021, APD responded to the call of a commercial burglary in progress. A security guard had another employee contact APD, and the employee provided a description of LOPEZ and informed APD that LOPEZ was across the street. APD found LOPEZ across the street standing next to a table. When they found LOPEZ, she had a warm glass bulbous pipe, a crystalline substance, and lighter next to her. During a search incident to arrest, law enforcement found stolen mail, access devices, personal identifying information ("PII") on documents, such as handwritten profiles, bank statements and tax documents, and SUBJECT DEVICES 2 and 3 in LOPEZ's bag.

## IV. STATEMENT OF PROBABLE CAUSE

9.  Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of this investigation, I am aware of the following:

**A. April 15, 2021 – Fraud Report by Victim M.S.**

10. On April 15, 2021, at approximately 4:30 p.m., APD Officer Joaquin Regalado-Zamora responded to a mail theft complaint from a victim in Arcadia, California. Officer Regalado-Zamora spoke with victim M.S., who stated that on April 15, 2021, at approximately 4:00 p.m., she received a notification from her mobile banking app informing her that multiple transactions were charged to her credit card that she did not authorize. M.S. identified the following fraudulent transactions: (1) a $10.55 charge at McDonalds, in Duarte, California; (2) a $10.64 charge at Cig Market, in Duarte, California; and (3) a $99.00 charge at Mail Box and Postal, in Arcadia, California.

11. M.S. notified her bank of the fraudulent activity and cancelled the credit card. M.S. then contacted Mail Box and Postal about the fraudulent charge. The store owner informed M.S. that the charge was for a post office box at the store location in Arcadia, California, and that the person who paid for the box placed the order over the phone. The store owner told M.S. that he had the information for the person who called but that he would not disclose the information to her.

12. M.S. stated the last time she collected her mail was on April 10, 2021, around 4:00 p.m. M.S. also stated that she

found mail on the street that belonged to her neighbors but did not think her mail had been stolen until she was notified of the fraudulent credit card charges.

    **B.    April 18, 2021 – APD Arrests LOPEZ**

    13.    On April 18, 2021, at approximately 12:37 a.m., Officer Kwan was wearing a police uniform and driving a marked patrol vehicle. Officer Kwan was on patrol in the City of Arcadia to deter mail theft and apprehend mail thieves. While driving in a residential area, Officer Kwan saw a female subject, later identified as LOPEZ, walking down the street. LOPEZ was wearing a white t-shirt, light colored pants, and a black jacket. Officer Kwan made eye contact with LOPEZ, and LOPEZ immediately dropped the black bag she was carrying. LOPEZ began running away from Officer Kwan.

    14.    Officer Kwan thought that LOPEZ's unprovoked flight was suspicious. Officer Kwan drove towards the black bag LOPEZ discarded and saw several pieces of mail on the ground directly next to it. Officer Kwan also saw that the mailboxes to three houses on the street were open. Officer Kwan inspected the mail on the ground and determined it was addressed to numbers on that same street where the mail was found and two nearby streets. Based on the open mailboxes, mail belonging to these mailboxes on the ground, and LOPEZ's unprovoked flight, Officer Kwan believed he interrupted LOPEZ as she was committing mail theft.

    15.    Officer Kwan advised APD dispatch about what he saw and requested assisting units to set up containment. Officers conducted a grid search of the area where LOPEZ was last seen.

While searching the backyard of a house in the neighborhood where Officer Kwan encountered LOPEZ, Officer Kwan saw an open door to a pool house. Officer Kwan made several verbal announcements for any occupants of the pool house to exit, but no one responded to him.

16. Officers entered the pool house to clear it of any suspects. Inside the bathroom of the pool house, Officer Kwan saw LOPEZ wearing a black jacket, white t-shirt, and light blue jeans sitting on the ground next to the sink. Officer Kwan immediately recognized LOPEZ as the subject who fled from him. Officers detained LOPEZ.

17. Officer Kwan searched the black bag and identified 13 access cards and numerous pieces of mail in names other than LOPEZ. Officer Kwan also recovered a glass bulbous pipe with a burnt white and tan residue and a black dagger on the lawn of the house with the pool house where he found LOPEZ.

18. Based on the fact that LOPEZ possessed 13 access cards and numerous pieces of mail in names other than LOPEZ, Officer Kwan arrested LOPEZ for violation of California Penal Code 530.5(c)(3), Identity Theft of more than ten persons.

   C.   **May 11, 2021 - USPIS Evidence Inventory**

19. On or about May 11, 2021, I responded to APD and took possession of the evidence related to LOPEZ's April 18, 2021 arrest. Based on my review of the physical evidence, LOPEZ was in possession of the following: 65 pieces of closed mail; 8 credit/debit cards, one of which is in the name of victim M.S.; two pre-paid/gift cards; and a black TCL cellular phone with a

cracked screen and silver circle attached to the case, bearing no visible serial number (SUBJECT DEVICE 1).

### D. May 15, 2021 – APD Arrests LOPEZ

20. In response to ongoing mail and package thefts in Arcadia, California, APD's investigations bureau placed "bait packages" equipped with Global Position System ("GPS") tracking devices throughout Arcadia. When the bait package moves, the GPS tracker activates and establishes connection to cellular towers and satellites. APD dispatch is then alerted of the bait package's movement and tracks the package. APD dispatch then notifies APD officers of the bait package's approximate location, the direction of travel, and the approximate speed of travel.

21. On May 13, 2021, APD placed a GPS bait package addressed to F.E. at a residential address in Arcadia, California. The GPS bait package was a white USPS Priority Mail flat rate box containing a GPS tracking device in an empty white Apple iPhone XR box.

22. On May 15, 2021, at approximately 4:05 a.m., APD dispatch notified Officer Dylan Morrill that the GPS bait package addressed to F.E. had activated. APD dispatch advised Officer Morrill of the GPS bait package location. Officer Morrill drove to the location where the GPS bait package was being tracked and saw a white BMW bearing California license plate number 8NAZ670 ("the BMW") traveling in the same direction that the GPS bait package was traveling. Based on the fact that the BMW was the only vehicle in the area and Officer Morrill's

7

knowledge of the GPS bait package location, Officer Morrill conducted a traffic stop of the BMW.  The driver of the BMW pulled over, and the sole occupant and driver of the vehicle was LOPEZ.  Officer Morrill immediately recognized LOPEZ from APD's arrest of her on April 18, 2021.

23. Officer Morrill approached the BMW and all the windows were rolled down.  Officer Morrill looked inside the BMW and saw the following in plain view: the GPS bait package on the rear passenger floorboard, and a white bag with multiple pieces of mail on the passenger seat.

24. Officer Morrill confirmed the GPS bait package was addressed to F.E. at the correct residential address in Arcadia, California.  He also saw that the mail in the white bag were in names other than LOPEZ.

25. Officer Morrill searched the BMW and recovered numerous pieces of mail not addressed to LOPEZ from 25 different addresses.  In total, Officer Morrill identified approximately 65 victims.  Officer Morrill also recovered approximately five access devices in names other than LOPEZ.

26. Based on the facts that LOPEZ was in possession of the GPS bait package, stolen mail and access devices, Officer Morrill placed LOPEZ under arrest for violation of California Penal Code Sections 530.5(c)(3), Identity Theft of more than 10 persons, and 530.5(E), Mail Theft.

27. Officer Morrill transported LOPEZ to APD Jail, Mirandized LOPEZ, and LOPEZ refused to provide a statement.

**E.  June 3, 2021 – USPIS Evidence Inventory**

28. On or about June 3, 2021, I took possession of the evidence related to LOPEZ's May 15, 2021 arrest. Based on my review of the physical evidence, LOPEZ was in possession of approximately 83 piece of mail and three credit/debit cards that did not belong to her.

**F.  June 30, 2021 – APD Arrests LOPEZ**

29. On June 30, 2021, at approximately 10:20 p.m., Officer Morrill was dispatched to the Residence Inn in Arcadia, California regarding a commercial burglary. APD dispatch informed Officer Morrill that the Residence Inn security guard, A.C., witnessed a female, later identified as LOPEZ, remove a lock and attempt to open the maintenance room. LOPEZ fled across the street and requested assistance from APD.

30. Officer Capra, who was already at the Residence Inn when Officer Morrill arrived, spoke with A.C. who stated he witnessed LOPEZ next to a locked gate near the pool house. A.C. observed the lock to the gate was bent but did not witness LOPEZ tampering with the lock. A.C. asked LOPEZ if she had a room at the Residence Inn, and she responded that she did not. LOPEZ left the property and A.C. contacted APD.

31. APD Sergeant Adam Hernandez also drove to the Residence Inn and met with A.C. A.C. told Sergeant Hernandez that he saw LOPEZ in the parking lot the Foothill Surgery Center across the street from the Residence Inn. Sergeant Hernandez went to the parking lot where he found LOPEZ standing next to a table and dirt planter in the parking lot.

9

32. Officer Morrill then arrived at the parking lot and recognized LOPEZ as the same person he arrested on May 15, 2021 for mail theft. Officer Morrill also recognized LOPEZ from her arrest on April 18, 2021 for mail theft. Officer Morrill spoke with LOPEZ about what she was doing in the parking lot, and LOPEZ stated she was staying with a friend at the Residence Inn but did not remember the friend's name. LOPEZ stated she was next to the pool house at the Residence Inn waiting for another friend to pick her up. LOPEZ then explained that she was confronted by a security guard who told her to leave the property. LOPEZ said she then walked across the street where she was for 20 minutes before being contacted by APD.

33. Officer Morrill saw multiple bags on the ground directly next to LOPEZ. LOPEZ stated the bags belonged to her. Officer Morrill looked in the dirt planter directly next to where LOPEZ was standing and saw in plain view a glass pipe with burnt residue inside and two crystalline rocks. Based on Officer Morrill's training and experience, he believed the pipe was a methamphetamine pipe and the crystalline rocks were methamphetamine. The glass pipe was also warm to the touch. Officer Morrill also located a black torch on the table where LOPEZ was sitting, which is commonly used by methamphetamine users to smoke methamphetamine. LOPEZ stated the torch belonged to her. LOPEZ denied that the pipe and crystalline substance belonged to her. Due to the fact that LOPEZ was standing directly next to a warm pipe and crystalline substance, Officer Morrill placed LOPEZ under arrest for violation of Health and

Safety Code Sections 11377(a), Possession of a Controlled Substance, and 11364(a), Possession of Unlawful Paraphernalia.

34. Officer Morrill then searched LOPEZ and her property. In LOPEZ's grey backpack, Officer Morrill recovered multiple documents to include handwritten profiles, bank statements and tax documents with PII on them. The majority of the PII pertained to residents in Arcadia, California. Based on LOPEZ being in possession of PII of approximately 27 victims, she was also arrested for violation of California Penal Code Section 530.5(c)(3), Possession of 10 or More PII.

35. While at APD Jail, Officer Morrill Mirandized LOPEZ, who refused to talk.

### G. July 8, 2021 – USPIS Evidence Inventory

36. On or about June 8, 2021, I responded to APD and took possession of the evidence related to LOPEZ's June 30, 2021 arrest. Based on my review of the physical evidence, LOPEZ was in possession of the following: approximately 27 pieces of mail; approximately five checks; one USPS money order; handwritten PII, including full account numbers and social security numbers; one U.S. Passport; a blue/black Motorola cellular phone bearing IMEI 355539116767359 ("SUBJECT DEVICE 2"); and a white Acer laptop bearing serial number LUS550B11190504F11601 ("SUBJECT DEVICE 3").

## V. TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSES

37. Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

a. People who steal mail are often involved in fraud and identity theft crimes. These individuals usually steal mail looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value. Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

b. It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft. Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

   c.   Mail and identity thieves often take pictures of items retrieved from stolen mail or mail matter with their cellphones.

   d.   It is also common for mail and identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

   e.   It is common for mail thieves, identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards.  Software relevant to such schemes can often be found on digital devices, such as computers.

   f.   Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  They often do so on their digital devices.  Suspects also often use their digital devices to communicate with co-

13

conspirators by phone, text, email, and social media, including sending photos.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

38. As used herein, the term "digital device" includes the SUBJECT DEVICES.

39. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remains on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

b.      Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.      The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.      Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

40. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

41. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a

16

user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

   b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

   c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. ~~Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress LOPEZ's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of LOPEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.~~

 42. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

17

## VII. CONCLUSION

43. For all the reasons described above, there is probable cause to believe that LOPEZ committed a violation of Title 18, United States Code, Section 1708 (Possession of Stolen Mail). There is also probable cause to believe the items to be seized described in Attachment B will be found in a search of the devices described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone this __18th__ day of ~~July~~ August
2021.

_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE